*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TONIA HARRIS, Personal Representative of the ESTATE OF ELIZABETH HARRIS,

        Plaintiff-Appellee,

v

RHEMA-BELMONT OPERATING, LLC, doing business as ADVANTAGE LIVING CENTER-HARPER WOODS,

        Defendant-Appellant,

and

ASCENSION ST. JOHN HOSPITAL,

        Defendant.

UNPUBLISHED
January 27, 2025
2:32 PM

No. 366510
Wayne Circuit Court
LC No. 22-014888-NH

TONIA HARRIS, Personal Representative of the ESTATE OF ELIZABETH HARRIS,

        Plaintiff-Appellee,

v

RHEMA-BELMONT OPERATING, LLC, doing business as ADVANTAGE LIVING CENTER-HARPER WOODS,

        Defendant,

and

ASCENSION ST. JOHN HOSPITAL,

        Defendant-Appellant.

No. 367678
Wayne Circuit Court
LC No. 22-014888-NH

-1-

Before: GADOLA, C.J., and RICK, and MARIANI, JJ.

PER CURIAM.

These consolidated appeals arise from a lawsuit initiated by plaintiff Tonia Harris alleging negligence and medical malpractice leading to the death of plaintiff's decedent, Elizabeth Harris. In Docket No. 366510, defendant Rhema-Belmont Operating, LLC (Advantage) appeals by leave granted the trial court's order denying its motion for summary disposition under MCR 2.116(C)(7). In Docket No. 367678, defendant Ascension St. John Hospital (Ascension) appeals by leave granted the same order denying its motion for summary disposition under MCR 2.116(C)(7), (8), and (10). We reverse and remand for entry of an order granting defendants summary disposition.

I. FACTS

On March 18, 2020, Elizabeth Harris (Harris), then age 70, went to Ascension's emergency room complaining of weakness, fever, chronic cough, nasal congestion, and shortness of breath. She tested positive for COVID-19, and was admitted to respiratory isolation. While in Ascension's care, Harris was diagnosed with COVID-19-related pneumonia. Six days later, on March 24, Harris was discharged to Advantage's nursing facility. Upon admission, Harris's diagnoses included "Parkinson's disease, tremor, fever, catarrhal, [end stage renal disease] on hemodialysis, acute bronchitis, diabetes mellitus, hypertension, anemia, cough, and pancytopenia," as well as COVID-19-related pneumonia. At that time, Harris did not have pressure injuries or pressure ulcers, which are areas of damaged skin and tissue caused by sustained pressure.[1]

Over the next two weeks, Harris was transferred multiple times between defendants' facilities for complications and procedures related to her hemodialysis port. Harris continued to test positive for COVID-19. On April 6, 2020, Harris was noted to have increased weakness and mental status changes, and was transferred to Ascension's emergency department. At the time, her skin was noted to be "clean, dry, and intact." On April 8, 2020, Ascension's staff assessed Harris as being at high risk for the development of pressure ulcers, and existing pressure injuries were observed. A progress note of April 13 indicated that Harris had developed Stage II pressure injuries.

On April 15, Harris was transferred back to Advantage's facility, where nursing staff noted two pressure injuries, which were black in the center and red around the edges. Daily wound-care instructions were ordered, but the records do not reflect that any wound care was performed on April 18, 20, or 21. After moving again to Ascension on April 22 for hypoxia, at which Harris again tested positive for COVID-19, Harris returned to Advantage. The record does not indicate that Harris received any wound care in the five days that followed.

---

[1] See Mayo Clinic, *Diseases & Conditions: Bedsores* <https://www.mayoclinic.org/diseases-conditions/bed-sores/symptoms-causes/syc-20355893> (accessed January 16, 2025).

On April 27, 2020, Harris was transferred to Ascension's emergency room. She again tested positive for COVID-19, and a physical examination revealed wounds "on her bilateral heels and a Stage III-IV decubitus ulcer over the sacral lumbar with pustular discharge." Harris was admitted to nephrology for management of her encephalopathy and end-stage renal disease, and palliative care was consulted. The assessment indicated that Harris was dying as the result of multiple factors, including "[s]evere progressive sepsis both bacterial and viral associated with prolonged COVID infection," and "necrotic secondarily infected decubitus ulcers on her sacrum and heels as source of Proteus bacteremia, advanced Parkinson's with inability to swallow, severe protein calorie malnutrition, and severe debility."

In the following days, Harris was evaluated by specialists in wound care, infectious disease, and palliative care. Harris was discharged to inpatient hospice care, and passed away on May 4, 2020. After Harris's death, the Department of Licensing and Regulatory Affairs issued Advantage citations for "failing to adequately assess a pressure ulcer, failing to update the care plan, and failing to document the completion of treatments."

Plaintiff, Harris's personal representative, filed a complaint alleging against defendants and their nursing staff ordinary negligence, gross negligence, and medical malpractice, and sought damages under the Wrongful Death Act, MCL 600.2922. Plaintiff alleged that defendants' staff committed "one or more negligent acts and/or grossly negligent acts and/or omissions, and breached the applicable standard of care by failing" to adequately assess and treat Harris's pressure sores, which resulted in sepsis that caused or contributed to her death. Plaintiff also alleged that defendants were grossly negligent by failing to select and properly train their employees.

Advantage moved for summary disposition under MCR 2.116(C)(7) on the basis that it was immune from liability under Michigan's Pandemic Health Care Immunity Act (PHCIA), MCL 691.1471, *et seq*. Advantage contended that it had immunity as a healthcare facility providing services in support of the state's response to the COVID-19 pandemic, and that Harris's pressure injuries were sustained by reason of those services. Advantage further contended that plaintiff failed to allege facts to demonstrate an exception to immunity under § 5 of the PHCIA, MCL 691.1475. Advantage also contended that it had immunity under the federal Public Readiness and Emergency Preparedness Act (PREP Act), 42 USC 247d-6d, because it was a "covered person" under the act and because "covered countermeasures" were used in Harris's care.

Ascension moved for summary disposition under MCR 2.116(C)(7), (C)(8), and (C)(10), also asserting immunity under the PHCIA and the PREP Act. Ascension contended that it was entitled to immunity under § 5 as a healthcare facility providing healthcare services in support of the state's response to the COVID-19 pandemic, and that Harris's injuries fell within the purview of the statute. Ascension also contended that plaintiff had not alleged facts supporting an exception to the immunity of § 5. Ascension also asserted that the federal PREP Act preempted plaintiff's state-law claim and provided Ascension immunity from liability as a covered person under the Act.

Plaintiff contended that defendants did not have immunity under the PHCIA, arguing that the care provided by defendants was not in support of the state's response to the COVID-19 pandemic because any failure to implement proper pressure-wound care was unrelated to COVID-19. Plaintiff also argued that she sufficiently pleaded an exception to the immunity under the

PHCIA by pleading gross negligence. Plaintiff also asserted that § 5 of the PHCIA was unconstitutionally vague. The trial court denied defendants' motions for summary disposition, stating:

> The service here extended between the time in which [the PHCIA] was in effect; April 8, 2020, and between that May 4th of 2020.
>
> As acknowledged by the defense, and I appreciate the candor, and I also appreciate just the straightforwardness, that the plaintiff has made a claim for willful misconduct, . . . or gross misconduct—which . . . of course . . . are exceptions to the rule under the [PHCIA].
>
> So those . . . claims have been made. And because they have been made, it would be improper for the Court to grant summary disposition motions on both Defendants.
>
> That is a question of fact for the trier of fact to determine what exactly is willful misconduct, gross negligence.
>
> * * *
>
> [E]ven under the PREP Act, they require that there's an exception, and that exception is your willful negligence, or willful misconduct.
>
> So, . . . in this case, the plaintiff has pled willful negligence, willful misconduct. It would be improper for this Court to dismiss based on the pandemic and the [PHCIA].

The trial court entered an order denying defendants' motions for summary disposition, and thereafter denied defendants' motions for reconsideration. This Court granted defendants leave to appeal and consolidated the appeals.[2]

## II. DISCUSSION

## A. THE PHCIA

## 1. CONNECTION WITH COVID-19

---

[2] *Estate of Elizabeth Harris v Advantage Living Ctr-Harper Woods*, unpublished order of the Court of Appeals, entered October 16, 2023 (Docket No. 366510).

Defendants contend that the trial court erred by denying their motions for summary disposition. Advantage contends that it is entitled to summary disposition under MCR 2.116(C)(7) because it is a healthcare facility under § 5 of the PHCIA, MCL 691.1475, and therefore has immunity from liability for Harris's injuries because Advantage provided Harris care in support of the state's response to the COVID-19 pandemic, and plaintiff failed to demonstrate that any exception to immunity applies.

Ascension contends that it is entitled to summary disposition under MCL 2.116(C)(7), (8), and (10), similarly asserting that it has immunity under § 5 of the PHCIA because it is a healthcare facility that provided healthcare services in support of the state's response to the COVID-19 pandemic, and Harris's injuries occurred during the applicable timeframe while Ascension was treating her for COVID-19. Ascension also contends that the trial court erred by finding that plaintiff pleaded gross negligence and willful misconduct, which are exceptions to § 5 immunity.

We review de novo a trial court's decision to grant or deny a motion for summary disposition. *Meemic Ins Co v Fortson*, 506 Mich 287, 296; 954 NW2d 115 (2020). We also review de novo the application and interpretation of statutes. *Spine Specialists of Michigan, PC v MemberSelect Ins Co*, 345 Mich App 405, 408; 5 NW3d 108 (2022). Summary disposition is warranted under MCR 2.116(C)(7) when a claim is barred by immunity granted by law, or another basis stated in that court rule. *Id*. When considering a motion under MCR 2.116(C)(7), we accept the contents of the complaint as true unless contradicted by the documentary evidence submitted by the moving party, and consider any affidavits, depositions, admissions, or other documentary evidence submitted. *Id*. at 409. If the facts are undisputed, whether a plaintiff's claim is barred under MCR 2.116(C)(7) is a question of law. *Id*.

A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of the claim, and is warranted when the claim is so unenforceable that no factual development could justify recovery. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159-160; 934 NW2d 665 (2019). When reviewing a trial court's decision to grant or deny summary disposition under MCR 2.116(C)(8), this Court considers the motion based upon the pleadings alone and accepts all factual allegations as true. *Id*. at 160.

By contrast, a motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the claim, and is warranted when no genuine issue of material fact exists. When considering the trial court's grant or denial of summary disposition under MCR 2.116(C)(10), we consider the documentary evidence submitted by the parties in the light most favorable to the nonmoving party, *El-Khalil*, 504 Mich at 160, and will find a genuine issue of material fact if the record leaves open an issue on which reasonable minds might disagree. *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018).

Section 5 of the PHCIA provides:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services

constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility.  [MCL 691.1475.]

Thus, to obtain immunity under § 5, the healthcare provider or healthcare facility must have been providing "health care services in support" of Michigan's "response to the COVID-19 pandemic," and the injury sustained during the relevant time period must have been "by reason of those services."  An exception to immunity is established if the provision of services constituted, *inter alia*, gross negligence or willful misconduct.  The immunity provided under § 5 applies to claims "on or after March 29, 2020 and before July 14, 2020."  MCL 691.1477.

In this case, the parties do not dispute that defendants were healthcare facilities, that defendants' nursing staff are healthcare providers, that defendants provided healthcare services in support of the state's response to the COVID-19 pandemic, and that Harris sustained the pressure ulcers that contributed to her death while in defendants' care during the applicable timeframe under MCL 691.1477.  The parties dispute, however, whether Harris's injuries were sustained "by reason of" those healthcare services provided by defendants in support of the state's response to the COVID-19 pandemic.  The parties also dispute whether plaintiff sufficiently pleaded an exception to § 5 immunity.

This Court recently determined that the immunity conferred by MCL 691.1475 is not limited to services provided to treat a patient for COVID-19.  In *Warren v McLaren Flint*, ___ Mich App ___, ___ ; ___ NW3d ___ (2024) (Docket No. 366226), the plaintiff suffered from pressure ulcers while intubated for COVID-19, allegedly because of the defendant's failure to provide appropriate treatment to prevent the pressure ulcers.  This Court construed "health care services in support of this state's COVID-19 pandemic" as used in § 5 to encompass "healthcare services that assisted, helped, or promoted the state's reactions and actions taken as a result of the COVID-19 pandemic, [including services provided] to those infected with COVID-19 and regular healthcare services provided during the statutory period."  *Id*. at ___; slip op at 8.  Because the plaintiff in *Warren* contracted pressure ulcers while being treated for COVID-19 as a "consequence of the care [the] defendant provided in response to COVID-19," this Court held that, "those injuries were sustained by reason of the healthcare services provided by [the] defendant in support of the state's response to the COVID-19 pandemic," and the defendant was therefore entitled to immunity.  *Id*. at __; slip op at 9.

This Court since has clarified in *Skipper-Baines v Bd of Hosp Managers for the City of Flint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365137); slip op at 4, that although immunity under the PHCIA is not limited to treatment provided to a patient to treat COVID-19 directly, some connection must exist between the pandemic and the medical services giving rise to the cause of action.  In *Skipper-Baines*, the decedent underwent a minor surgical procedure to treat his gallbladder disease.  When he returned to his room, he was attacked and injured by his roommate, whom the defendant knew to be a mentally unstable patient.  The decedent's condition thereafter declined, and he died.  The autopsy report listed COVID-19-associated pneumonia as a contributing cause of the decedent's death.  This Court determined that the defendant did not have immunity under § 5 of the PHCIA because "there is simply no

connection between the pandemic and the alleged negligence/malpractice." *Id*. at ___; slip op at 5. This Court explained:

> The services that allegedly caused the injury in this case were not given "in support of this state's response to the" pandemic. This lawsuit stems entirely from the beating inflicted upon the decedent by his roommate. The record suggests that the decedent did not contract COVID-19 until after he was hospitalized due to an unrelated illness, and at the time of the attack, he was recovering from a gallbladder procedure. The roommate was likewise not being treated for COVID-19, and there is no suggestion that COVID-19 in some way spurred the attack. The alleged negligent act was placing him in a room with an unsafe roommate, and the alleged omission was failing to deploy adequate safeguards to protect the decedent from the roommate [who] was known to be unsafe. It is clear to us that neither of those were done in support of the pandemic response. [*Id*. at ___; slip op at 3.]

This Court in *Skipper-Baines* thus determined that the defendant in that case was not entitled to immunity under the PHCIA because the alleged negligence and malpractice arose from the defendant's alleged acts and omissions leading to the attack, and not from any alleged pandemic-related inadequacy of care. This Court reasoned that unlike *Warren* where "there was a clear connection between the pandemic and services giving rise to the cause of action," in *Skipper-Baines* there was "simply no connection between the pandemic and the alleged negligence/malpractice." *Id*. at ___; slip op at 5.

In this case, Harris tested positive for COVID-19 when she arrived at Ascension's emergency room. While being treated by defendants for COVID-19-related pneumonia, among other conditions, she developed pressure ulcers, which later were identified as a contributing cause of her death. Although her wound care was not directly in response to her COVID-19 diagnosis, a connection exists between the care provided to Harris, which allegedly led to her developing pressure ulcers, and the pandemic.[3] As in *Warren*, MCL 691.1475 applies to the healthcare

---

[3] We reject, however, a reading of *Warren* that suggests far-reaching blanket immunity under § 5 of the PHCIA for *all* injuries and deaths occurring during the applicable time frame. This Court in *Warren* stated in part:

> Addressing the remainder of the statutory language, immunity is granted only when injury or death has been "sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained," unless subject to an exception. This broad language demonstrates that all possible deaths or injuries are covered by the statute unless excepted. [*Warren*, ___ Mich App at ___; slip op at 9.]

The statement that "all possible deaths or injuries are covered by the statute unless excepted" is modified by the Court's preceding statement that "immunity is granted only when injury or death has been sustained by an individual by reason of those services [provided in support of this state's response to the COVID-19 pandemic]." We also observe that the statement regarding all possible

services that defendant provided to Harris, and defendants therefore are entitled to immunity under § 5 unless an exception to that immunity applies.

Plaintiff argues that the care Advantage provided was not in support of the state's response to the COVID-19 pandemic because Harris had recovered from COVID-19 by the time she was transferred to Advantage. The record does not support this contention. Plaintiff's progress notes from both defendants show that Harris continued to test positive for COVID-19 and to suffer from COVID-19-related symptoms. Accordingly, defendants are entitled to immunity with respect to plaintiff's claims of ordinary negligence and medical malpractice.

## 2. EXCEPTIONS TO § 5 IMMUNITY

Defendants contend that the trial court erred by finding that plaintiff had sufficiently alleged an exception to § 5 immunity by pleading willful misconduct and gross negligence. Defendants argue that plaintiff did not allege willful misconduct and only cursorily asserted that defendants' acts and omissions were grossly negligent. We agree.

Willful misconduct is defined by the PHCIA as "conduct or a failure to act that was intended to cause harm." MCL 691.1473(e). Plaintiff's complaint does not allege willful misconduct, nor does it allege facts to support a claim that defendants intended to harm Harris. To the extent the trial court found that plaintiff pleaded willful misconduct, the trial court erred.

The complaint does allege that defendants' acts and omissions constituted gross negligence. To survive a motion for summary disposition when the claim alleged is gross negligence, however, a plaintiff must allege specific facts or "present evidence that the contested conduct was substantially more than negligent." *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App 363, 383; 838 NW2d 720 (2013) (quotation marks and citation omitted). We determine the gravamen of a complaint by looking at the complaint as a whole to discern the actual nature of the claim. *Jeffrey-Moise v Williamsburg Towne Houses Cooperative, Inc*, 336 Mich App 616, 625; 971 NW2d 716 (2021).

The PHCIA defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1473(a). This definition is identical to that used in the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, see MCL 691.1407(8)(a). The Legislature therefore is presumed to be aware of the courts' interpretation of that definition, see *Jackson v Nelson*, 252 Mich App 643, 651-52; 654 NW2d 604 (2002), and we therefore may resort to interpretations of the language under the GTLA when interpreting the identical language here.

---

deaths or injuries is obiter dictum because that question was not specifically at issue in *Warren*, and the statement therefore lacks the force of adjudication. See *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Michigan*, 333 Mich App 457, 497; 960 NW2d 186 (2020). As clarified by this Court in *Skipper-Baines*, this Court in *Warren* "did not accept plaintiff's invitation to render nugatory any of the statutory language" of MCL 691.1475. *Skipper-Baines*, ___ Mich App at ___; slip op at 5.

Grossly negligent conduct must be "substantially more than negligent." *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999) (referencing the GTLA's definition of "gross negligence"). "Generally, allegations or evidence of inaction or claims that a defendant could have taken additional precautions are insufficient." *Bellinger v Kram*, 319 Mich App 653, 660; 904 NW2d 870 (2017). This Court has characterized gross negligence, as statutorily defined in the GTLA, as "a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver v Smith*, 290 Mich App 678, 685; 810 NW2d 57 (2010).

The factual allegations of plaintiff's complaint indicate that Harris developed pressure wounds sometime between April 6 and April 8, while in Ascension's care. By April 15, Harris returned to Advantage's care, where "healing wounds" with black centers and red borders were noted. Advantage assessed Harris for her risk of developing pressure sores, and, the next day, Harris's wounds were cleaned and redressed. On April 17, Harris's pressure wounds were assessed again, and a treatment plan was issued. Harris was eventually transferred between defendants' facilities several more times before her final stay with defendant Ascension commenced on April 27; no documentation in the record demonstrates whether Harris's pressure ulcers were treated as ordered. On the basis of these facts, plaintiff alleged that defendant Advantage's nursing staff committed grossly negligent acts or omissions.

Read as a whole, the allegations in the complaint do not rise to the level of gross negligence. Defendants' nursing staff was aware of Harris's pressure wounds and undertook affirmative measures to care for her condition. Under the facts alleged, no objective observer could conclude that the conduct of defendants' nursing staffs was "so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1473(a). Rather, plaintiff has alleged claims of ordinary negligence and medical malpractice, which is insufficient to avoid the immunity of § 5. Accordingly, the trial court erred by finding that plaintiff had adequately pleaded a claim for gross negligence.

### 3. VAGUENESS

We reject plaintiff's contention that defendants are not entitled to summary disposition because § 5 is unconstitutionally vague. Plaintiff argues that the phrase, "services in support of this state's response to the COVID-19 pandemic," allows for numerous interpretations and gives a trier of fact unlimited discretion in determining whether a statute has been violated. This Court in *Warren* determined that although the phrase "services in support of this state's response to the COVID-19 pandemic" allows numerous interpretations, whether a statute supports several interpretations is not the standard for determining whether a statute is constitutionally defective on vagueness grounds. *Warren*, ___ Mich App at ___; slip op at 12. This Court determined that the void-for-vagueness doctrine did not apply, because "[t]he First Amendment is not implicated, the statute gives fair notice of the conduct it regulates, and the statute does not give the trier of fact unlimited discretion in determining if the statute is violated. . . . The statute sets boundaries for its application. Through other subsections, the Act clearly defines 'health care services' and 'health care facility' as used in the statute. Additionally, [§ 5] does not apply to injuries sustained as a result of gross negligence or certain intentional conduct, and the statute limits its applicability to a set period of time." *Id*. at ___; slip op at 12-13. Plaintiff's argument on this basis is therefore without merit.

## B. THE PREP ACT

Defendants also contend that the trial court erred by denying their motions for summary disposition because they are entitled to immunity under the federal PREP Act. Advantage asserts that it is a covered person under the PREP Act because plaintiff's claims arise out of, or relate to, Advantage's use of covered countermeasures under the Act. Similarly, Ascension contends that it is entitled to immunity as a covered person under the PREP Act, and argues that plaintiff's injury bore a causal relationship to a covered countermeasure because Ascension's staff was using protective gear and devices to prevent the spread of Harris's COVID-19. We conclude that defendants are not entitled to immunity under the PREP Act.

The federal PREP Act authorizes the Secretary of the United States Department of Health and Human Services to determine that "a disease or other health condition or other threat to health constitutes a public health emergency," or poses "a credible risk" of a future such emergency. 42 USC 247d-6d(b)(1). The Secretary may then "make a declaration . . . recommending, under conditions as the Secretary may specify, the manufacture, testing, development, distribution, administration, or use of one or more covered countermeasures." *Id*. After such declaration, under the PREP Act "a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure. . . ." 42 USC 247d-6d(a)(1). Thus, under the PREP Act, immunity is available only if the injury is caused by an individual's use of a covered countermeasure.

Under the PREP Act, a "covered person" includes a healthcare professional that administered the "covered countermeasure." 42 USC 247d-6d(i)(2)(B)(iv), (i)(8)(A). The Act defines a "covered countermeasure" to include "a qualified pandemic or epidemic product (as defined in [42 USC 247d-6d(i)(7)]," which includes a FDA-approved "drug . . . biological product . . . or device" that is authorized for emergency use under the Federal Food, Drug, and Cosmetic Act; as well as "a respiratory protective device that is approved by the National Institute for Occupational Safety and Health . . . ." 42 USC 247d-6d(i)(1). Subparagraph (2)(B) clarifies the parameters of the causal relationship that must exist between the loss and the covered countermeasure:

> The immunity under paragraph (1) applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, pre-scribing, administration, licensing, or use of such countermeasure. [42 USC 247d-6d(a)(2)(B).]

Accordingly, under the PREP Act, unlike § 5 of the PHCIA, a COVID-19-related treatment, product, or countermeasure must cause the injury for immunity to apply. Additionally, immunity applies under the PREP Act only if "the countermeasure was administered or used for the category or categories of diseases, health conditions, or threats to health specified in the declaration." 42 USC 247d-6d(a)(3)(B). "At the very least, then, for PREP Act immunity to apply,

-10-

the underlying use or administration of a covered countermeasure must have played some role in bringing about or contributing to the plaintiff's injury. It is not enough that some countermeasure's use could be described as relating to the events underpinning the claim in some broad sense." *Hampton v California*, 83 F4th 754, 764-765 (CA 9, 2023).

In this case, even assuming defendants and their staff are a "covered person" under the PREP Act, Harris's injuries and death lack a causal relationship to the use of a covered countermeasure. The direct and proximate cause of Harris's death, as alleged in plaintiff's complaint, was defendants' failure to properly treat Harris's pressure ulcers, and not the use of a drug, biologic, diagnostic, device, or vaccine used to treat, diagnose, prevent, or cure COVID-19. Accordingly, the alleged causes of Harris's injuries and death were not plainly within the meaning of "covered countermeasure." Contrary to defendants' assertions, the mere use or presence of personal-protective equipment and droplet-precaution isolation to prevent the spread of COVID-19 during Harris's care does not, without more, establish a causal connection between Harris's death and a covered countermeasure. Accordingly, defendants were not entitled to summary disposition on the basis of immunity under the PREP Act.

Reversed and remanded for entry of an order granting defendants summary disposition. We do not retain jurisdiction.


/s/ Michael F. Gadola
/s/ Michelle M. Rick
/s/ Philip P. Mariani

-11-